**ABSAR REALTY CO. v. BOWLES, Price Administrator.**

**No. 189.**

United States Emergency Court of Appeals.

Heard at New York Feb. 28, 1945.

Decided June 1, 1945.

Gerard M. Bloomfield, of New York City, for complainant.

Warren L. Sharfman, Chief, Court Review Rent Branch, of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, Charles P. Liff, and Murray J. Madison, all of Washington, D. C., Attys., all of the Office of Price Administration, on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.

MAGRUDER, Judge.

Complainant owns and operates an apartment building at 3900 Greystone Avenue in the Fieldston-Riverdale Section, the Bronx, New York City, and as such is subject to the Rent Regulation for Housing for the New York City Defense-Rental Area issued October 8, 1943, effective November 1, 1943. 8 F.R.13914. On March 1, 1943, the maximum rent date established by the regulation, complainant was supplying for use of its tenants a free private bus service to the schools, shopping and amusement centers, and also to the 207th Street and Broadway station of the Eighth Avenue Independent Line subway and to the 242nd Street station of the Broadway-Seventh Avenue subway line of the Interbor-

[13] See Northwood Apts., Inc. v. Brown, 137 F.2d 809 (E.C.A.1943).

ough Rapid Transit. Of the two, the IRT station at 242nd Street is much nearer complainant's building, being a half a mile or less away, but the Independent line is much preferred because it is newer, better equipped, and faster, with much fewer stops on the way downtown to 42nd Street. Complainant's apartment is situated on a very high point in the city, and according to one affidavit in the record "it is only with extreme difficulty that the average woman could walk up the hill from the 242nd Street subway station if she had any encumbrances or impediment in her hands." On April 1, 1943, complainant was obliged to discontinue this accommodation bus service in compliance with an order of the Office of Defense Transportation. Thereafter, on February 14, 1944, the Area Rent Director instituted proceedings under § 5(c) (3) of the regulation to decrease complainant's maximum rents on account of a substantial decrease in services since the maximum rent date. As a result of such proceedings, the Rent Director, on February 28, 1944, issued a group of orders decreasing by 5 per cent the maximum rents of complainant's apartment units now in question. Complainant duly protested these orders, and on November 6, 1944, the Administrator denied the protest, after which the present complaint was filed.

The protest did not challenge the validity of any provision in the regulation, but was directed against adjustment orders under § 5 decreasing complainant's maximum rents. Therefore the general question before us on review is whether the Administrator has correctly applied the adjustment provisions in question, and whether, under the terms of the regulation and on the evidence in the record, there was a rational basis for the Administrator's conclusion that complainant's maximum rents should be reduced 5 per cent as representing the decrease in rental value of the subject housing units as of the maximum rent date by reason of the discontinuance of the free bus service.

The relevant provisions of the regulation are as follows:

"Sec. 3. *Minimum services, furniture, furnishings and equipment.* Except as set forth in section 5(b), every landlord shall, as a minimum, provide with housing accommodations the same essential services, furniture, furnishings, and equipment as those provided on the date determining the maximum rent, and as to other services,

furniture, furnishings and equipment not substantially less than those provided on such date: * * *

"Sec. 5. Adjustments and other determinations. In the circumstances enumerated in this section, the Administrator may issue an order changing the maximum rents otherwise allowable or the minimum services required. In those cases involving * * * an increase or decrease of services, * * * the adjustment in the maximum rent shall be the amount the Administrator finds would have been on March 1, 1943, the difference in the rental value of the housing accommodations by reason of such change: Provided, however, That no adjustment shall be ordered where it appears that the rent on the date determining the maximum rent was fixed in contemplation of and so as to reflect such change. * * *

"(b) Decreases in minimum services, furniture, furnishings and equipment—(1) Decreases prior to November 1, 1943. If, on November 1, 1943, the services provided for housing accommodations are less than the minimum services required by section 3, the landlord shall either restore and maintain such minimum services or, on or before November 30, 1943, file a petition requesting approval of the decreased service. * * *

"(3) Adjustment in maximum rent for decreases. The order on any petition under this paragraph may require an appropriate adjustment in the maximum rent; and any maximum rent for which a report is required by this paragraph may be decreased in accordance with the provisions of section 5(c) (3). * * *

"(c) Grounds for decrease of maximum rent. The Administrator at any time, on his own initiative or on application of the tenant, may order a decrease of the maximum rent otherwise allowable, only on the grounds that: * * *

"(3) Decrease in services, furniture, furnishings or equipment. There has been a decrease in the minimum services, furniture, furnishings or equipment required by section 3 since the date or order determining the maximum rent.

"Sec. 13. Definitions.—(a) When used in this regulation the term: * * *

"(7) 'Services' includes repairs, decorating and maintenance, the furnishing of light, heat, hot and cold water, telephone, elevator service, window shades, and stor-

age, kitchen, bath, and laundry facilities and privileges, maid service, linen service, janitor service, the removal of refuse and any other privilege or facility connected with the use or occupancy of housing accommodations."

On several grounds complainant contends that no reduction at all was warranted:

■ First, it is urged that the discontinuance of the bus service was involuntary on the landlord's part and in obedience to the command of another federal agency. This is true, but the regulation, providing for a decrease in maximum rents on account of a substantial decrease in services, makes no distinction based upon the reason for the decrease of services. As the Administrator points out in his opinion, to permit the landlord to maintain the old rental charge after discontinuance of the bus service would have the same inflationary effect whether the bus service were given up by the landlord voluntarily or involuntarily.

Second, it is objected that the discontinuance of the bus service did not constitute a "substantial" decrease of services within the meaning of Section 3 of the regulation. This objection was not contained in the protest, and hence, strictly, is not properly before us. But we may say that the evidence fully warranted the Administrator's determination in this respect.

Third, complainant urges that all of its leases in effect on the maximum rent date "contemplated and provided for the discontinuance of the bus service in question, and in each lease the rent was provided for accordingly." [1] Hence, complainant claims that no reduction of maximum rents should have been imposed, because of the proviso in the first paragraph of Section 5 of the regulation reading: "Provided, however, That no adjustment shall be ordered where it appears that the rent on the date determining the maximum rent was fixed in contemplation of and so as to reflect such change." The leases which were in effect on March 1, 1943, the maximum rent date, were negotiated in the spring and summer of 1942. While these leases provided that the landlord might in its discretion discontinue the private bus service without abatement of the stipulated rent, the evidence clearly indicates that at the time the leases were negotiated the parties did not contemplate an actual discontinuance of the service, and did not strike their bargain as to the amount of the rent on the assumption that the bus service which had been supplied by the landlord since 1936 was to be discontinued thereafter. Indeed, complainant thought it necessary at that time to reassure its tenants as to the maintenance of the private bus service, which for many years had been a very important item in the competitive conditions of the rental market. On July 1, 1942, when, apparently, an erroneous report had been circulated that the Office of Defense Transportation had already ordered curtailment of apartment house bus service, a representative of complainant wrote to that agency asking for an official denial of the report, stating: "We have received wholesale notices that our tenants will move in October, unless they receive now an official determination, of the bus status, on your stationery." The Administrator was fully warranted in concluding that the rents in effect on the maximum rent date were not fixed so as to reflect a contemplated discontinuance of the bus service.

■ Fourth, and closely relating to the preceding objection, it is urged that there should have been no decrease in maximum rents because the discontinued service had been a "gratuity." True, the landlord was not contractually bound to maintain the service, but it is hardly accurate to describe as gratuitous a service the existence of which was one of the important inducements held out to tenants at the time the leases were negotiated. At any rate, the point is not well taken, for the criterion in the adjustment pro-

[1] The reference is to clauses 18 and 23 of the leases. Clause 18 provided: "It is expressly understood and agreed that the Landlord shall have the right * * * to discontinue bus or transportation service, if any, at any time the said Landlord may, in its discretion, deem it expedient to do so, in which event the Tenant hereby irrevocably expressly agrees and consents to the same." Clause 23 provided: "This lease is accepted by the Tenant as subject to the rules, regulations and orders which may be promulgated from time to time by any government agency during the national emergency. Compliance of the Landlord therewith or failure to furnish any service or material by reason thereof shall not in any manner relieve the Tenant from performing all of the terms of this agreement including the payment of the rent reserved herein."

vision in question is whether there has been a substantial decrease in the services in fact being furnished by the landlord on the maximum rent date. See Johnson v. Bowles, Em.App.1944, 145 F.2d 166, 167. As stated by the Administrator in denying the present protest: "In a normal rental market unaffected by housing shortages induced by war activities the discontinuance of even a 'gratuitous' service which tenants have come to expect would result in a decrease in rental value, even though the decrease could not evidence itself in a rent reduction until the expiration of the term of the rental agreement in effect at the time of the discontinuance. Consequently, the Administrator has uniformly taken the position that the Regulation was designed to stabilize and maintain the true economic bargain and status existing between the landlord and tenant on the maximum rent date, rather than the enforceable formal agreement."

There remain to be considered complainant's objections to the amount of the decrease in maximum rents ordered by the Rent Director and confirmed by the Administrator in the protest proceedings.

The yardstick for determining the amount of the reduction to be made in maximum rents on account of a decrease in services is set forth in Section 5 of the regulation as follows: "In those cases involving * * * an increase or decrease of services, * * * the adjustment in the maximum rent shall be the amount the Administrator finds would have been on March 1, 1943, the difference in the rental value of the housing accommodations by reason of such change * * *." In applying this standard, the cost to the landlord of the discontinued service is a factor properly to be taken into account, but such cost is not in itself the sole measure of the adjustment. Hence it is not very significant that the cost to complainant of maintaining the bus service was $3600 annually, whereas the aggregate reduction in complainant's maximum rents ordered by the Rent Director amounted to $4581 annually.

An affidavit filed by Mr. Louis Weisman, complainant's vice-president, cites figures to show that the furnishing of bus service did not increase the rental value of the sub-ject apartments and that as a competitive factor this service could have been discontinued at any time without affecting their rental value. But this claim is quite at variance with the testimony of the same Mr. Weisman before the House Committee on Banking and Currency in May, 1944, as follows:

"Now for 7 years of the operation of this building—it was built in 1929—we ran no busses to the subway, because the subway was only 4 blocks away, the Broadway subway at Two hundred and Forty-second Street and Broadway. After that, competition became very keen. The advent of the Eighth Avenue subway, which was a cleaner and faster transportation and a mile farther south necessitated our furnishing to our tenants bus transportation because of the keen competition and the number of vacancies that we had and we brought our tenants down to the Eighth Avenue subway. * * * *"[2]

Mr. Weisman's affidavit states that after complainant instituted the free bus service in 1936, the average rents in the apartment building, instead of increasing, actually decreased somewhat. But in the competitive conditions then existing, the inference is a fair one that such decrease was due to other factors and that complainant's average rents would have declined to even a greater extent but for the fact that it began to furnish bus service to meet the competition of other apartment house operators in the zone. The affidavit also points to the fact that, after the bus service was discontinued in April, 1943, complainant succeeded in leasing many apartments in the building at no reduction of rent. This may well be accounted for by the fact that the rental market was beginning to feel the inflationary pressure of defense activities and by the further fact that private bus service had ceased to be a competitive factor because of the general order of the Office of Defense Transportation affecting all landlords in the zone equally. Under the adjustment provision, the crucial date is the maximum rent date, March 1, 1943; and it is quite evident that at that time the existence of the private bus service was an important factor reflected in the rental value of the apartments. In further support of the claim that the bus service did not increase the rental value of complain-

---

[2] Hearings before the House Committee on Banking and Currency, 78th Cong., 2nd Sess., H.R. 4376, p. 1629.

ant's apartments, Mr. Weisman refers to a nearby apartment building at 3660 Waldo Avenue which never furnished private bus service but which had an average rent per room per month somewhat higher than the average rent of complainant's apartments. But no facts are given from which it would be possible to judge whether the two apartment buildings are comparable as to size of apartments, equipment, or other features, except that it does appear that the apartment referred to was built in 1941 whereas complainant's building was constructed in 1929.

One objection strongly pressed is that complainant's rents have been reduced in accordance with a uniform formula applied generally throughout the zone, whereas the adjustment provision calls for a determination of the decrease in rental value of each particular housing unit separately as a result of the decrease in services furnished to the respective tenants. Since the decrease in services resulting from the order of the Office of Defense Transportation called for an adjustment in rents of many thousand housing units in the zone, it was obviously desirable, in order to simplify the administrative task, to find, if possible, some reasonable general formula of adjustment which could be fairly thought to have presumptive validity as applied to all the housing units involved, in the absence of a showing of special circumstances applicable to some particular unit or group of units.

The Administrator incorporated into the record a joint affidavit by A. H. Phillips and M. S. Goodman, who fully qualified as experts in rental valuation in the area. They express their considered opinion that "erection and successful renting of apartment house developments in the Fieldston-Riverdale area of the Bronx, in which the subject premises are located, was because of topographical conditions and distances involved, dependent upon the furnishing of such free private bus transportation to and from rapid transit facilities, to and from shopping centers and to and from schools." They point out that the problem arising from the elimination of private bus service was one common to several other geographical zones in Bronx County. In order to arrive at a more accurate determination of the decrease in rental value of the units in question as a result of the elimination of private bus service, affiants made surveys not only of the Fieldston-River-

dale zone but of other similar zones in Bronx County. Messrs. Phillips and Goodman state that, in arriving at their final determinations, they gave consideration to the following factors:

"1. Rental ranges in the houses supplied with bus service to determine the variation of the rents in each section.

"2. Rentals in each section, in houses of similar age and construction with and without bus service.

"3. Cost of the bus service to the landlord.

"4. Additional cost to the tenant occasioned by the discontinuance of the service.

"5. Present inconvenience to subway transportation and the shopping sections of each area. This includes a study of the distances involved and the topographical conditions.

"6. Adequacy of public streetcar or bus transportation.

"7. Size of the dwelling unit (number of rooms) in relation to the rental ranges.

"8. Average number of persons per dwelling unit in relation to the number of rooms.

"9. The fact that discontinuance was by governmental order."

Elaborate data were compiled by them relating to the cost of the bus service to the landlords in each zone, the number of apartments and rooms in each zone, and the average cost per room. A study was made to note the differences in average rent per room between those buildings for which free bus service was supplied and those not so serviced. The physical terrain of each zone was considered. Numerous interviews with landlords and tenants were held.

Affiants made an analysis of various possible methods for determining the amount of the adjustment. They properly rejected the cost of the bus service to the landlord as the sole basis for the adjustment. They concluded from their comparable studies that there was such lack of uniform variations between the rentals of apartment houses serviced and those not serviced by private bus that the use of this differential as the sole basis for adjustment would not be justified. They rejected a flat dollars-and-cents reduction per room as unfair and discriminatory in application: "If the sum were small, the tenant in the higher priced unit would consider it inconsequential, and if the sum were large it might average 10

to 12 per cent of the rental and would obviously be out of all proportion to the landlord of the lower priced unit." Further, they said, the additional transportation costs to tenants caused by the discontinuance of private bus lines cannot be calculated with any degree of accuracy, "nor would this be any true test of the reduced rental value." They gave it as their opinion "that the application of a uniform zone-wide percentage reduction of the rents charged on the maximum rent date most accurately reflects the difference in rental value as a result of the decreased service." This method, they said, would "have a tendency to equalize the adjustments inasmuch as those apartments which were rented at a lower figure than other similar units, will receive a smaller adjustment."

Upon a careful consideration of all the factors set forth in the affidavit, Messrs. Phillips and Goodman stated their expert opinion to be "that the elimination of private bus service constitutes a substantial decrease in an essential service and that a uniform reduction of 5 per cent of the rents charged on the maximum rent date in the Fieldston-Riverdale area correctly reflects the decrease in rental value of the subject accommodations by reason of such decrease in services."

In his opinion accompanying the order denying the protest, the Administrator said:

"The factors which must be considered are varied and often intangible. Certain more or less concrete considerations such as cost to the landlord and cost to the tenant for substitute public service are present. Other factors are more difficult to evaluate. The convenience of a private direct service, the value of a school bus service, the desirability of one rapid transit system as against another, the inconvenience of shopping in the absence of the service, the inadequacy of substitute facilities, these are intangibles which can be appraised only by the expert who has had experience in the particular area concerned and has acquired an understanding, impossible to communicate in precise terms, of the value placed thereon by residents in the area. In attempting to evaluate such a service it is possible only to seek the most nearly accurate approximation and the most reasonable method of applying that approximation."

He accepted the conclusion of Messrs. Phillips and Goodman that "the closest approximation of the difference in rental value may be reached in any single instance by taking a fixed percentage of the maximum rent." The Administrator fully reviewed complainant's individual situation in order to determine whether it presented any special factors which would invalidate the application to complainant's apartments of a uniform 5 per cent reduction representing the general zone-wide decrease in rental value by reason of the discontinuance of private bus service. He concluded, then, upon the entire record, "that the difference in the rental value of each of the protestant's housing accommodations as of the maximum rent date by reason of the discontinuance of the service was not less than five (5) per cent of the maximum rents for such housing accommodations."

Complainant has not suggested any satisfactory alternative method for computing the decrease in rental value and, as the Administrator notes, "has failed to adduce any affirmative evidence as to the resulting difference in rental value, other than the assertion that it is identical with cost to the landlord."

There is other evidence in the record, which we have considered, but do not deem it necessary to set forth. The affidavits and rebuttal affidavits are in disagreement on many factual details, but it is not our function to weigh conflicting evidence. Complainant has failed to maintain the burden of convincing us that the Administrator's determination of the amount of the reduction in maximum rents was arbitrary or capricious or lacking in evidential support.

Judgment will be entered dismissing the complaint.