## ROUMEL v. GOLDBERG.
### No. 351.

Municipal Court of Appeals for the
District of Columbia.

March 5, 1946.

Rehearing Denied March 21, 1946.

See, also, D.C.Mun.App., 40 A.2d 253.

Samuel W. McCart, of Washington, D. C., for appellant.

Harry Friedman, of Washington, D. C., for appellee.

Before CAYTON, Chief Judge, and HOOD, Associate Judge.

HOOD, Associate Judge.

Plaintiff, a tenant in an apartment house, sued his landlord for an alleged violation of the applicable minimum service standard. The statement of claim sought recovery of $50, plus an attorney's fee, in accordance with Section 10(a) of the District of Columbia Emergency Rent Act. Code 1940, § 45—1610(a). After trial judgment was entered for plaintiff for $50, with an attorney's fee of $10; and the landlord has appealed.

Plaintiff's testimony was that he had occupied the apartment for approximately eleven years, that on and prior to January 1, 1941, (the freeze date under the Act) there was a resident manager of the apartment house; that there continued to be one until August 31, 1945, but since that date the building had been without a resident manager.

The tenant contends that the services of a resident manager were included in the minimum service standard, and that proof of the absence or withdrawal of such manager automatically established a violation of the service standard. This argument cannot stand. The term "resident manager" is a loose one, and inquiry

must be made to determine whether the removal of the resident manager resulted in a decrease in the service standard. It is common knowledge that services rendered by resident managers vary greatly in diffent apartment buildings. In some buildings the resident manager devotes but a trifling amount of his time to his duties and has limited authority and responsibility. In other buildings, the resident manager is a full-time executive performing over-all functions similar to those vested in the active manager of a mercantile organization. In this case the record is silent as to the functions, authority, and responsibilities of the resident manager. There was evidence, and the trial court so found, that the removal of the resident manager resulted in the tenant being deprived of a definite time and place on the premises to pay his rent; and of being deprived of a place on the premises where packages could be received for him in his absence.

■ With respect to payment of rent, the tenant testified that, during the time there was a resident manager, he paid his rent in cash to the resident manager at her apartment on the first day of each month; that after removal of the resident manager there was neither person nor place designated for receipt of rent, and he was forced to call the landlord on the telephone and the landlord sent his son to the tenant's apartment to collect the rent.

We think these facts do not constitute a reduction in services. Assuming that a place or person for receiving rent can be considered a service supplied in connection with the use and occupancy of housing accommodations, we think that the law permits a landlord to designate a different agent to receive rent without being liable to a claim for reduced services. In the absence of agreement, rent is payable on the premises (House v. Lewis, 108 Neb. 257, 187 N.W. 784, 23 A.L.R. 877, and annotation following at page 883), and there is no showing that the landlord demanded its payment elsewhere. If the tenant does not wish to mail a check for his rent to the landlord, but prefers to pay it in cash, we think there is no reduction in services when the tenant can wait for the landlord's agent to come to collect, instead of going to an agent in the building to make payment.

With respect to the question of receiving packages, the tenant testified that, during the time there was a resident manager, packages for delivery to the tenant would, in the tenant's absence, be received at the resident manager's apartment. The resident manager had other employment and was away from the apartment house during the entire day; but in her absence some member of her family was in her apartment and accepted packages for tenants. According to the landlord, after dismissal of the resident manager, he regarded the janitor as a resident manager and authorized him to receive packages for tenants. Though there had been a sign in the lobby indicating the location of the resident manager's apartment, there was none indicating where the janitor could be found. The trial court found that on January 1, 1941, the tenant was furnished a resident manager who provided a definite place where packages for the tenant were accepted in his absence, and beginning September 1, 1945, the landlord has failed and refused to furnish a resident manager to provide a place where packages could be left for the tenant in his absence. Does that finding justify the court's conclusion that there was a violation of the minimum service standard?

■ The property was rented on January, 1, 1941, and since it does not appear that the Administrator ever adjusted the service standard, the minimum service standard is the service to which the tenant was "entitled" on January 1, 1941. Code 1940, 45—1602. The fact that the tenant was furnished certain services on January 1, 1941, does not necessarily mean he was entitled to such services. The word "entitled" means having a right to, and, therefore, the service standard consists of the services which the tenant had a right to receive on January 1, 1941. Some of the services he was receiving on that date may have been furnished gratuitously or as a matter of courtesy or even of good will, but not as of right. The test provided by the statute is not what service was being *furnished* but the service to which the tenant was *entitled* on that date.

The closest analogy to the District of Columbia Emergency Rent Act is the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 901 et seq., and the Housing Regulations issued thereunder. The National Act was passed subsequent to the District Act and though their fundamental purposes are the same, there are some striking differences between them. The National Act, so far as housing accom-

modations are concerned, operates largely through the Administrator's regulations. The District Act is detailed and the Rent Administrator's discretion in applying its provisions is limited.

Section 3 of the National Housing Regulations defines minimum services to be "the same essential services," and "other services * * * not substantially less," than those "provided" on the date determining the maximum rent. As a result it has been held that the Regulations do not distinguish between services which are provided as part of a contract of tenancy or those which are gratuitously provided. Johnson v. Bowles, Em.App., 1944, 145 F.2d 166; Absar Realty Co. v. Bowles, Em.App., 1945, 149 F.2d 654. The difficulty which may be encountered in determining whether a particular service was provided as a matter of right was pointed out in Johnson v. Bowles, supra; but since the District Act specifically and expressly fixes the standard as the services to which the tenant was entitled, we see no way to avoid this difficulty under our Act.

It may well be that the reason the Regulations fix the minimum services as all services "provided" on the maximum rent date, whether or not the tenant was entitled to such services, is due to the less stringent features of the National Act and Regulations respecting a landlord's liability for decrease in services. The District Act provides that for violation of a service standard the tenant may sue for double the value of the services refused or for $50, whichever is greater. The National Act confines the tenant's action for damages to cases of overcharges in violation of maximum prices, and makes no provision for damages for violation of service standards. It is true that the Regulations permit an appropriate reduction in rent when services are decreased, but consider-

able discretion is given the Administrator in such matters. See Regulations, Section 5. Furthermore, unlike the District Act, the Regulations distinguish between "essential services" and "other services." In short, the Regulations are far more flexible with respect to services than is the District Act; and this may explain the use by the Regulations of the broader term "provided" rather than the restricted term "entitled" found in our Act.

■ Our conclusion is that under the District of Columbia Emergency Rent Act a tenant in order to obtain damages for violation of a service standard must show that he has been deprived of a service to which he was entitled as of right. Therefore, the finding of the trial court that the tenant has been denied a service which was furnished to him on January 1, 1941, is not sufficient to sustain the judgment. The case must be sent back for retrial. At the new trial evidence may be had, and a finding made, on the question whether the tenant was entitled to the service of which he was deprived.

■ We are not to be understood as holding that for a tenant to be entitled to a service, such service must be specifically contracted for in the lease or rental agreement. For example, many apartment leases contain no reference to the landlord furnishing heat and water, yet such services are implied incidents of the tenancy and the tenant is as much entitled to them as if specifically contracted for. O'Hanlon v. Grubb, 38 App.D.C. 251, 37 L.R.A.,N.S., 1213. There are, however, a class of services to which the tenant may or may not be entitled and the question must be answered by the particular facts of each case.

Reversed with instructions to award a new trial.