**BENENSON REALTY CORPORATION v. PORTER, Price Adm'r.**

**No. 304.**

United States Emergency Court of Appeals.

Heard at New York City June 12, 1946.

Decided Nov. 20, 1946.

Robert S. Tyson, of New York City, for complainant.

Betty L. Brown, of Washington, D. C. (Richard H. Field, Gen. Counsel, Jacob D. Hyman, Assoc. Gen. Counsel, Harry H. Schneider, Chief, Court Review Rent Branch, and Philip Travis, Atty., all of Washington, D. C., all of the OPA, on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

McALLISTER, Judge.

This case is concerned with the Rent Regulation for Housing in the New York City Defense Rental Area.[1]

On January 8, 1945, the Rent Director for the New York City Defense Rental Area entered orders decreasing, by 25%, the maximum rents of fifty-two apartments in the premises at 220 East 18th Street, Brooklyn, New York, because of the elimination by the owner of certain services theretofore supplied and rendered. The Price Administrator sustained the orders of the Rent Director, and the present complaint was thereafter filed.

---

The apartments are located in a six-story apartment house, which contains 100 apartments, of which 66 consist of three-room apartments; 17, of two rooms; and 17, of one room—or a total of 249 rooms.

The Maximum Rent Date was March 1, 1943. At that time, the premises were owned by another party. They were subsequently purchased by complainant on September 1, 1944.

In 1943, at the time maximum rents were established, the 52 apartments, which are the subject of this controversy, were rented furnished with maid, linen, laundry. and window-cleaning services. The maid service consisted of light cleaning of each apartment five days each week, and thorough cleaning once each week. The linen service included the supplying of towels, bath mats, shower curtains, and bed linens. Laundry service consisted of the laundering of the linens supplied by the landlord.

On the Maximum Rent Date, only three apartments were rented without the above mentioned services. Primarily, the apartments in the building were rented to employed couples and other persons desirous of obtaining services which would result in a minimum of housekeeping. The building itself was designed and constructed for use as an apartment hotel, and was so operated, until complainant corporation appeared upon the scene.

The rents, on the Maximum Rent Date, for the furnished apartments ranged from $65 to $90 per month for the three-room units; from $60 to $70 per month for the two-room units; and from $40 to $55 per month for the one-room units. There was no fixed charge for any of the services. Variations in the rentals represented variations in the charge for the services as well as in the charges for the shelter itself, and, also, for the furniture supplied.

In September, 1944, complainant corporation purchased the building. Immediately, it sought, by petition, to discontinue the maid, linen, and laundry services. In its petition, complainant set forth the value

which it placed upon the discontinued services, at $5 per month for a one-room unit; $7.50, for a two-room unit; and $10, for a three-room unit. This valuation, it arrived at, by a comparison and analysis of rentals for other apartments in the same building which had been leased unfurnished and without services. It compared the differences in rental for these accommodations, and those rented furnished and with services, and estimated that at least half of the difference in rent could be attributed to furniture. The remaining amount it assumed to be the rental value of the special services.

No action having been taken on the petition by the Area Rent Director, prior to October 31, 1944, complainant withdrew its petition. The services in question were then discontinued as to the 52 apartments here in question during November, 1944. The window-cleaning service had been discontinued by the former owner during June, 1944. After complainant filed a report showing discontinuance of the services as above mentioned, the Area Rent Director, after proper notice to complainant, followed by further proceedings, entered an order decreasing the maximum rents for each of the 52 apartments, in amounts equivalent to 25% of the rents received on the Maximum Rent Date. This reduction was based upon a finding that 25% was the amount of decrease in rental value to which the apartments would have been subject, if the decrease in services had occurred on the Maximum Rent Date. These rental decreases were made effective as of the dates of the discontinuance of the services. The reason for making the decrease in rentals thus effective was because the services had been discontinued while the premises were occupied, without orders having been secured permitting the decrease of services, and without a showing that it was impossible for the landlord to maintain the services.[2]

Upon the entry of the Area Rent Director's order, complainant filed a protest with

[2] The provisions of the order of the Area Rent Director were made in accordance with Sections 5(b) (2) and 5(b) (3) of the Regulation, which provide:

"Section 5(b) (2). Decreases after November 1, 1943.—Except as above provided, the landlord shall, until the accommodations become vacant, maintain

the Administrator, requesting consideration thereof by a Board of Review. In its protest, it contended that the proper test of the rental value for the discontinued services was what the landlord charged for such services on the Maximum Rent Date; that such an amount should be calculated by a comparison between rentals with such services, and rentals without them, in the same building; and that the maximum rents after the decrease should not be established at a level below "comparability" with substantially similar units in other apartment buildings. Complainant asked that the rental value of the services which it had eliminated be established at $10 per month for the three-room apartments; at $7.50, for the two-room apartments; and at $5, for one-room apartments. After the hearing of arguments, the Board of Review recommended denial of the protest. It held that the proper measure of the rent reduction for each of the subject units was the rental value of the discontinued services on the Maximum Rent Date. As the Board remarked: "To deduct more would reduce the maximum rents of the remaining facilities below their maximum-rent date level; to deduct less would increase the maximum rents of the remaining facilities above their maximum-rent date level. The landlord is

to be neither penalized nor rewarded for discontinuance of the special services, whatever may be the inconvenience or loss sustained by the tenants. Rent reduction orders may not properly be employed as a means of deterring landlords from the discontinuance of essential services." The Board found that a rent deduction of 25% for all of the apartments in question, because of the elimination of the services, was fair and reasonable in view of all of the elements in the case, and that this reduction would amount to less than the actual costs incurred by the landlord as of the Maximum Rent Date in rendering these services. The Administrator adopted the Board's recommendations, and, as has already been stated, denied the protest.

Complainant contends that the 25% reduction in rentals ordered by the Administrator, as a result of the discontinuance of the services in question, was arbitrary, unreasonable, and invalid; and that it was not supported by evidence that the value of the services, so discontinued, equaled this amount.

In this regard, it is conceded that the determination of the Administrator must be sustained unless it is proved to be arbitrary or is not supported by substantial

---

the minimum services, furniture, furnishings, and equipment unless and until he has filed a petition to decrease the services, furniture, furnishings, or equipment and an order permitting a decrease has been entered thereon; however, if it is impossible to provide the minimum services, furniture, furnishings, or equipment he shall file a petition within 10 days after the change occurs. When the accommodations become vacant the landlord may, on renting to a new tenant, decrease the services, furniture, furnishings, or equipment below the minimum; within 10 days after so renting the landlord shall file a written report showing such decrease.

"(3) Adjustment in maximum rent for decreases.—The order on any petition under this paragraph may require an appropriate adjustment in the maximum rent; and any maximum rent for which a report is required by this paragraph may be decreased in accordance with the provisions of section 5(c) (3). If the landlord fails to file the petition or report required by this paragraph within the time specified, or decreases the services, furniture, furnishings or equipment without an order authorizing such decrease where such order is required the rent received by the landlord for any rental period commencing on or after such decrease or November 1, 1943, whichever is the later, shall be received subject to refund to the tenant of any amount in excess of the maximum rent which may later be fixed by any order decreasing the maximum rent on account of such decrease in services, furniture, furnishings, or equipment. In such case, any order decreasing the maximum rent shall be effective to decrease such rent from the beginning of the first rental period after the decrease in services, furniture, furnishings, or equipment or after November 1, 1943, whichever is the later. The foregoing provisions and any refund thereunder do not affect any civil or criminal liability provided by the Act for failure to comply with any requirement of this paragraph."

evidence. See Homewood Development Co., Inc. v. Bowles, Em.App.,1945, 148 F. 2d 850; Absar Realty Co. v. Bowles, Em. App.,1945, 149 F.2d 654.

We shall discuss first, the contention of the complainant that the Administrator's use of a uniform percentage reduction of rentals, because of the discontinuance of services, was improper and arbitrary, and an unauthorized and invalid method; and secondly, the claim that there was no evidence that such a percentage reduction of rentals corresponded to the value of the services which were discontinued.

With respect to the adoption by the Administrator of a uniform percentage reduction of rentals for the elimination of services by a landlord, it has been said that, in cases involving a decrease in the furniture, furnishings, or equipment supplied, or a decrease in services, the adjustment to be made in the maximum rent is the amount which the Administrator finds would have been—on the Maximum Rent Date—the difference in the rental value of the accommodation by reason of such change. Homewood Development Co., Inc. v. Bowles, supra. It is urged by complainant, however, that instead of a uniform percentage reduction in rentals, because of a decrease in services, the reduction in rentals should be based upon comparable accommodations; and it is pointed out that, in the Homewood case, this court approved the Administrator's opinion in which it was stated that the best criterion for ascertaining the difference that should prevail in rentals between apartments with furniture, and those without furniture, is that "based upon substantially identical units (particularly where comparable to protestants'), the one rented furnished and the other unfurnished on January 1, 1941. In this manner the most accurate approximation of the difference in rental value by reason of furniture is obtained." 148 F.2d at page 853. Relying upon the authority of the Homewood case, complainant urges that the best evidence of the amount by which the rentals should be reduced because of discontinued services is the actual difference in rents of comparable units with and without such services; and com-

plainant emphasizes that the Administrator and his expert witnesses committed their crucial error in this case when they made no effort to ascertain differences in rentals in comparable units with and without similar special services.

Complainant's argument with respect to the necessity of ascertaining differences in rentals in comparable units, fails for the reason that the record is barren of evidence on which to base a comparison between units in other buildings with and without the services in question. No substantially similar units are shown by the evidence; and, while the Administrator presented data with respect to two other buildings in which services comparable to those discontinued by the complainant were provided, it does not appear in the record that these, or any other, buildings were comparable in additional respects to complainant's building. On this phase of the case, the only question presented is not whether an order based on some other theory or evidence would be proper, or whether proofs—which are not available and do not appear in the case—would be more persuasive, but whether there is substantial evidence to support the Administrator's determination. It is our conclusion that in cases where rents are reduced because of the elimination of services, it is not necessary to base decision solely upon "comparability," or even to consider such comparability as a factor, where evidence of substantially similar units is not available.

In this case there was no evidence of any uniform or definite schedule of charges for the various services. They were all lumped together and the rentals worked out by bargaining between landlord and tenant. Moreover, rents for similar units, of the same number of rooms, in the building, varied substantially—for one-room units, from $40 to $55 per month; for two-room units, from $60 to $70 per month; and for three-room units, from $65 to $85 per month. In addition, the number of apartments rented without furniture and services was too few to be representative; and, even in these cases, the rentals in certain instances were higher for unfurnished ac-

commodations than for those which were furnished and rented with services.

We may here observe that the mere recital of the foregoing facts would seem sufficient to dispose of one of the arguments advanced by the complainant—that the Administrator should have arrived at a valuation of the discontinued services by a comparison and analysis of rentals for other apartments in complainant's building which had been leased unfurnished and without services. For the variation between the rentals of apartments of the same number of units, and the fact that rentals for some of the unfurnished apartments were higher than for the furnished apartments, indicates clearly that there was no reasonable possibility of arriving at a valuation of the eliminated services by comparisons between these units in the same building.

The Price Administrator held that the Maximum Rent Date rents in the building in question "were established as a result of bargaining between landlord and tenant for the facilities and services provided, without any attempt to segregate the rent into its component elements, and * * * no such segregation is mathematically possible." We are in accord with the conclusion of the Administrator that to provide merely a uniform dollar decrease for apartments of each size would not properly reflect the portion of the rental value of each unit attributable to the eliminated services. It seems clear that the use of the percentage method provided the fairest and most practicable means for determining the deductions from the rentals for each unit, allocable to the eliminated services. In this case, we are of the opinion that the use of a uniform percentage reduction of rentals for the elimination of services was justified and proper. See Absar Realty Co. v. Bowles, supra.

We come to the discussion of complainant's second contention which may be generally summarized in the statement that there was no evidence that the percentage reduction of rentals in this case corresponded to, or approximated, the value of the services which were eliminated by the landlord.

In arriving at the value of the services which were discontinued, the Administrator took the figures which were submitted to him by complainant as the cost of maid and laundry service during the first quarter of 1943, the base period. These figures disclose that the maid service averaged $670 per month, and the laundry service, $372 per month, or an aggregate of $1,042. To this amount, the Administrator added a total of $435, made up as follows: $50 per month for social security and workmen's compensation charges; $100, as the value of rooms for maids, and for the storage of linens; $125 as the monthly wages of a housekeeper; and $160 as the monthly wages of a manager. The addition of these items to the figure furnished by complainant brought the costs allocated to the services for the apartment building to $1,477 per month. In addition to this, the Administrator took into consideration charges for linen replacements, and charges for window-cleaning. From the evidence, there may be computed monthly charges for the replacement of linens of $53, and monthly window-cleaning charges of $97.-85—or a total for the costs, above enumerated of $1,627.85. This was for all the services in the entire apartment building.

There were 130 rooms in the 52 units here in question for which reduction of rentals was made. The total number of rooms receiving the services in the apartment building was 231. Adopting the ratio contended for by complainant to ascertain the service costs allocable to the rooms here in controversy, we use 56.3% of the total costs of $1,627.85 for all the rooms in the apartment building, to find the costs allocable to the 130 rooms in question. That cost amounts to $916.48. The total reduction of rentals ordered by the Administrator aggregated $914. Since the aggregate amount of the rental reductions was less than the cost of furnishing the services, there would seem to be no ground upon which to base a complaint.

However, complainant emphatically objects to certain items of costs added by the Administrator to the figures for maid and laundry service, totalling $1,042, which was admitted by complainant.

First, it may be remarked that complainant agrees that the addition of $50 per month for social security and workmen's compensation charges is proper. It further admits that the addition of the sum of $100 for the rental value of maids' rooms and rooms for the storage of linens is justified. The items to which it objects are: $125 for housekeeper's wages; $160 for a manager's wages, and the charges for replacement of linens and window-cleaning. It insists that there was no evidence upon which to base charges for replacement of linens and window-cleaning; and that it was unnecessary to employ a housekeeper and manager in order to furnish the services in question.

We shall first discuss the question of window-cleaning and linen replacement. In arriving at the value of the services of window-cleaning and linen replacement, the Administrator considered the services in other apartment buildings which he adjudged comparable to those formerly supplied to the subject units.

As bearing upon the value of the eliminated services, the Administrator had before him the schedule of charges, as of the Maximum Rent Date, for maid and linen services in apartment premises located at 67 Hanson Place, in Brooklyn, which was submitted by the agent of the landlord of such premises. Maid service was supplied for such premises on the basis of $5 per month for one room, $7.50 per month for two rooms, and $10 per month for three rooms. Linen service was supplied on the basis of $5 per month for one person, $7.50 per month for two persons, and $3 per month for each additional person. Applying this schedule to the premises here in controversy, and taking account of the number of occupants, it appeared that the total charges, under the schedule of charges for the premises at 67 Hanson Place, would amount to $868 per month for maid and linen services for the 52 apartments which are the subject of the present case. This apparently did not take into consideration charges for replacement of linens and did not include window-cleaning services. With regard to the Hanson Place premises, it was indicated that a reasonable allowance for window-cleaning services was $1.25 per month for a one-room unit, $1.60 for a two room unit, and $2.10 per month for a three-room unit, and using this schedule as comparable to the services here in question, the window-cleaning expense would be calculated at $97.85 per month for the 52 subject units.

In order to arrive at his conclusions as to what would be a proper uniform percentage reduction of rentals because of the discontinued services here in question, the Administrator also considered the services rendered in other apartment buildings which he adjudged comparable to the services formerly supplied to the subject units.

The Area Examiner had ascertained that charges for like services for apartment premises located at 70 Remsen Street, Brooklyn, were not uniform for similar or comparable units, but had been used as bargaining factors, and did not return the costs of providing the services. The costs of maintaining these services represented, it was concluded by the Examiner, about 20% of the total rents charged, without taking into consideration the expense of window-washing or, apparently, replacement of linens—although this latter factor is not of crucial importance in our consideration of the case.

To the use of the Hanson Place premises and the Remsen Place premises as comparable to the subject apartment building, complainant strongly objects.

It is contended by complainant that the Area Rent Examiner was mistaken in the figures which he used in comparing the value of the services for the Hanson Place premises, inasmuch as the agent of the landlord who was claimed to have furnished them made a statement setting forth that such figures were incorrect, and that they were only a partial schedule of charges for services at an apartment house premises located in an entirely different part of the city—at 52 Clark Street, Brooklyn—and that such services could not be considered as comparable with those which had been previously furnished to the 52 subject units. But the evidence introduced on behalf of the Administrator is in sharp contradiction to this assertion; and the sworn statement of one of the Area Rent Inspectors sets

forth without any qualification whatever that the Hanson Place schedule figures used by the Area Rent Examiner were precisely the figures given by the agent of the landlord for the Hanson Place apartments, which the inspector simultaneously recorded in his memorandum book, and which the agent of the landlord refused to furnish in writing.

It should here be emphasized that it was not claimed by the Administrator that the different apartment buildings or apartments, at Hanson Place or on Remsen Street, were comparable as accommodations, but merely that the services rendered therein were comparable to those formerly furnished to the subject units, and that these were used purely as some evidence upon which to base reasonable conclusions as to the rental value of the services.

All of the foregoing indicates a reasonable basis for the uniform percentage reduction in rentals, as well as a reasonable basis for an estimate of the window-cleaning expenses.

As to the necessity of the employment of a manager and a housekeeper in order to furnish the services in question, and the inclusion as an expense of their salaries as computed by the rent officials, the Administrator was justified in looking to the experience of the prior management in the base period. With respect to the complaint that it was improper to include the wages of a housekeeper and manager without segregating the extent of their duties to the discontinued services and the other operations in the building, the Examiner determined that the duties of these employees pertained to the discontinued services and that all of the wages of these employees were properly allocable thereto; and complainant presented no evidence to rebut this finding but merely states that such employees may have had other duties.

It must be admitted that the record is somewhat incomplete with respect to the various costs here in question. There appears to be no direct evidence of the cost of linen replacement. However, in the report and recommendations of the Board of Review, it is stated with citations from the transcript of oral argument, that, at the hearing, Mr. Benenson, an executive of complainant corporation, had "stated that the actual cost of supplying the linens (apparently excluding laundry service, for which under his proposal the tenants were to pay separately) was $425 per month."

This amount, complainant states, would be such an excessive cost of replacement of linen that it is fantastic to assume that it is correct. But the Administrator replies to this contention with the statement that, assuming that the purport of Mr. Benenson's statement before the Board of Review to be that the cost of supplying linens, *including the laundry expense,* was $425 per month, then the deduction of the laundry expense which appears, by complainant's own declaration, to have been approximately $372 per month, left $53 per month as the cost of linen replacement. We are of the opinion that this amount may be properly used for such cost, in calculating the total costs of the services which were eliminated by the landlord after the base period.

We have, then, heretofore considered the basis for the Administrator's conclusions as to the uniform percentage reduction of rentals which he ordered as a result of the discontinuance of services by the landlord. In addition, we have indicated how, from another aspect, the calculations by the rent officials of the separate items—replacement of linens, housekeeper's and manager's salaries, and window-cleaning costs—may be justified in arriving at a valuation of the various services which were eliminated. But, further, it is to be emphasized that the Administrator's conclusions were also supported by the opinions of the examiners and inspectors of the Rent Branch of the Office of Price Administration. From the record, it appears, without question, that these officials had expert qualifications in the rental field in the area in question. They made physical inspections of the subject accommodations and interviewed tenants and housekeeper with respect to the nature of the services provided. They found that there were no customary and definite charges for the dis-

continued services in the subject building or in the area generally, and that it was, therefore, necessary to consider a variety of factors in determining their rental value. They gave their reasons for the propriety of the decrease in rental value by reason of the reduction in services by furnishing an estimate of the value of each service based on a consideration of the size, layout, closet space, and other physical characteristics of the subject accommodations, the nature and amount of the services provided, the expense and inconvenience to the tenants in providing the services themselves, and the relative importance of the services in the rental bargain. They considered that the subject building was constructed to be operated as an apartment hotel with the services in question and that the size and layout of the rooms was such as to make such services an integral and necessary part of the rental arrangement. As an instance, they took into consideration that the smallness of the rooms and the lack of closet space were adapted only to the type of establishment in which the special services were provided. There is nothing in the record that would indicate that these officials were not able, qualified, honest, and careful in their investigations; and their expert opinions and conclusions appear to be fully supported by the facts as set forth in their elaborate and comprehensive survey.

It is unnecessary to dispose of all the various minor contentions raised in this case. We have in mind, among other matters, the claim that the accuracy of certain evidence is sharply questioned by complainant, such as the affidavit of one of the apartment corporation's officials that the rental for a certain unfurnished apartment, without services, cost more than a similar apartment of the same size with furniture and services. If this statement were erroneous, it would, nevertheless, not affect our determination herein. Furthermore, it appears that the secretary of the complainant corporation, in an affidavit upon information and belief, set forth that the window-cleaning services had been previously rendered by porters employed at no additional cost to the landlord. But the fact that such service was performed by employees who had other duties in the building and that no expense allocation was made thereto did not establish the fact that no costs are attributable to that service. If porters performed the window-cleaning service as part of their duties, it would seem to follow that a portion of their wages was properly allocable to that service.

Some objection has been made to the fact that the orders reducing the rents were made retroactive by the Administrator. However, Sections 5(b) (2) and 5(b) (3) of the Rent Regulation provide that "the landlord shall * * * maintain the minimum services * * * unless and until he has filed a petition to decrease the services * * * and an order permitting the decrease has been entered thereon;" in this case the services were discontinued before any order was entered permitting such action. It is to be said, moreover, that complainant has not pressed this point in its brief.

In accordance with the foregoing, it is our conclusion that the order of the Administrator, decreasing the rents for the 52 apartment units in question because of the discontinuance of services by the landlord, was made in compliance with the provisions of the statute, and was supported by substantial evidence.

A judgment will, therefore, be entered dismissing the complaint.