WOODS, Housing Expediter, v. FOREST HILLS SOUTH, Inc., et al.

No. 21172.

United States Court of Appeals
Second Circuit.

Jan. 11, 1949.

Francis X. Riley, Special Litigation Atty., Ed Dupree, Gen. Counsel, Hugo V. Prucha, Asst. Gen. Counsel, and Nathan Siegel, Special Litigation Atty., all of Washington, D. C., and Sylvan D. Freeman, Regional Director, of New York City, Office of the Housing Expediter, for plaintiff appellant Tighe E. Woods, Housing Expediter.

Pollock & Berger, of New York City (Max Edelman, of New York City, of counsel), for defendants-appellees.

Before SWAN, AUGUSTUS N. HAND and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The corporate landlords own and operate seven apartment buildings containing multiple housing accommodations which are subject to the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A. Appendix § 901 et seq., and the Housing and Rent Act of 1947, as amended, 50 U.S.C.A. Appendix, § 1891 et seq., and the Rent Regulation promulgated thereunder. The buildings with one exception have garage units under each structure providing space for a total of 276 cars. The total number of apartments is 610. The corporate defendants have owned and operated the apartment buildings and the garage units since approximately the year 1939. The garages are for the exclusive accommodation of the tenants of the multiple dwellings including the tenants of the building which contained no garage space. On the rent-freeze date, March 1, 1943, and up to November 30, 1946, the practice of the defendant corporations was to provide garage space at $10 per month at the option of tenants and landlords, and there was no showing that

during the period involved in this case any tenant was refused garage space who desired to have it. On and after December 1, 1946, the defendants demanded and received the sum of $15 per month for garage space without applying to the area rent director for an increase for the use of such space.

Each of the leases of housing accommodations provided that: "This letting and hiring does not include the use of garage space." Garage space was made available to the tenants under separate agreements simultaneously with the leasing of an apartment or during interval periods. The registration certificates of the landlords provided that the services furnished did not include garage space.

The Housing Expediter claimed that the defendants have demanded and received from certain tenants $5 per month garage rental in excess of the ceiling fixed for such rental and brought the present action to obtain an order directing a refund of the excess to the tenants entitled thereto, as well as an injunction to prevent future violations. The District Judge held that the exclusion of garage services in the registration certificate and in the apartment leases negatived the claims of the Housing Expediter and the Judge accordingly dismissed the complaint and entered a judgment to that effect, from which the plaintiff has appealed.

The plaintiff relies on Section 13(a) (6) of the Rent Regulation which defines "housing accommodations" as meaning any building offered for rent for living purposes, "together with all privileges, services * * * connected with the use or occupancy of such property," and Section 13(a) (7) defining "services" as including any "other privilege or facility connected with the use or occupancy of housing accommodations."

We think that the garage services which were for the sole benefit of tenants while they held apartments and were apparently made available to any such tenants providing only there was space should properly be classified as services "connected with the use or occupancy of housing accommodations," within the meaning of Sections 13 (a) (6) and 13(a) (7) of the Regulation.

It is true that the privilege of garage service was initially subject to the condition that the space was not already taken by others and even after being granted to a tenant who applied for it was subject to termination at will by the landlord under the terms of the contract for the service. Nevertheless, these contingencies would not prevent an actual occupancy from being a facility connected with the use of housing accommodations, so long as only tenants of those accommodations could occupy garage space, and there has been no proof that any tenant who wanted the space was refused it or that his occupancy was terminated by the landlord.

In spite of the provision in the leases that the letting of apartments did "not include the use of garage space," it can fairly be said to have been the understanding of the parties prior to the rent-freeze date of March 1, 1943, that any tenant had the privilege of obtaining garage service at $10 a month. Such an understanding as we have indicated would undoubtedly serve as an inducement to any prospective tenant who might contemplate the need of garage space during his tenancy. That the understanding existed is evident from the fact that some of the tenants entered into agreements for garage service at the times when they leased their apartments.

The test whether the garage service was a facility connected with the use of the apartments is the general understanding of the parties, and not the contractual liability of the landlord to furnish such service. This is borne out by the decisions of the Emergency Court of Appeals in Absar Realty Co. v. Bowles, 149 F.2d 654, and Johnson v. Bowles, 145 F.2d 166. While the contract is doubtless some evidence of the understanding, its effect in the case at bar is overcome by the actual conduct of the parties.

In Absar Realty Co. v. Bowles, supra, a landlord furnished his tenants with free private bus service to schools, shopping centers, and subways. In his leases which were in effect on the freeze-date he had expressly reserved the right to terminate this service. He did terminate it because ordered to do so by the Office of Defense Transportation. Although the termination

was compulsory, the Emergency Court affirmed an order of the Area Rent Director reducing the rents of the landlord based on the deprivation of facilities connected with housing accommodations. In this connection, Judge Magruder, writing for the court, said [149 F.2d 656]:

"While these leases provided that the landlord might in its discretion discontinue the private bus service without abatement of the stipulated rent, the evidence clearly indicates that at the time the leases were negotiated the parties did not contemplate an actual discontinuance of the service, and did not strike their bargain as to the amount of the rent on the assumption that the bus service which had been supplied by the landlord since 1936 was to be discontinued thereafter."

The decision in Johnson v. Bowles, supra, adopted similar reasoning. There the landlord had rented a house to a tenant under a lease which did not include an adjacent garage. Later, but before the freeze-date, the tenant placed his automobile in the garage and occupied it without protest upon the part of the landlord for about two years. After the freeze-date, the landlord attempted to charge rent for the garage but was denied the right by the Emergency Court on the ground that such a charge because it covered a facility connected with the use of the house was an unlawful increase of rent, even though the original service was admittedly a gratuity on the part of the landlord.

It is argued by the defendants that the facts in the case at bar are to be distinguished from those in the decisions we have discussed because here there was an express provision in the lease that it did not include garage facilities. That distinction hardly applies to the Absar Realty decision and likewise would seem to be inapplicable to a gratuity not included in the lease or even in the general understanding of the parties at the time the lease was made which seems to have been the situation in Johnson v. Bowles, supra. As we have already said, the question is: What was that general understanding prior to the freeze-date; and we think it was that a tenant might reasonably expect to obtain garage facilities in connection with his lease if they were not already completely occupied.

An official interpretation of the Administrator under date August 14, 1942, is quoted in part in the margin,[1] and seems to support our view.

The defendants rely on the decision of the Emergency Court in Fury v. Fleming, 161 F.2d 189. That court set aside an order of the Administrator which had reduced the rent of the landlord on the ground that he had not furnished painting to his tenant. Though the landlord had done so on one occasion after the making of the original lease and prior to the freeze-date, he filed an affidavit to the effect that at the inception of the tenancy, it was agreed that the tenant was to do all necessary painting at his own expense. Under these circumstances, and among other things for want of any proof that the landlord was not doing the painting for the benefit of his own property rather than under any arrangement with the tenant, the court held that any presumption of an obligation to supply decoration of the apartment in the future which might arise from the painting that had been furnished was insufficient to overcome the specific agreement that the landlord would not have to do painting. In the case at bar, there was no understanding that the tenants were not to get any garage space, but the understanding was evidently and at all times quite the contrary.

 The suggestion of the trial judge that the defendants' registration certifi-

---

[1] Assume that the maximum rent date is April 1, 1941, and the effective date of the Housing Regulation is June 1, 1942.

1. On January 1, 1941, prior to the maximum rent date, L leases a house to T for one year at a monthly rent of $50. On February 1, 1941, likewise prior to the maximum rent date, L by separate agreement leases a garage on the premises to T at a monthly rent of $5. Both house and garage are being rented by T on June 1, 1942, the effective date of the Regulation.

The housing accommodations include both house and garage and the maximum rent is $55.00 a month for the two.

cates which stated that garage space was not included in the leases affect the issues before us seems unwarranted. These certificates in no way bind the Housing Expediter and at best can only furnish ex parte information on which corrective measures may be based. Kalwar v. McKinnon, 1 Cir., 152 F.2d 263, 264.

For the foregoing reasons the judgment is reversed and the cause remanded in order that the court below may compute the excess rents due the tenants and make an appropriate refunding order as well as grant any proper injunctive relief.